LEIGH M. CLARK, Retired Circuit Judge.
This is an appeal from a verdict and judgment finding defendant guilty of murder in the first degree of William Clark, alias Bud Clark, and sentencing him to life imprisonment.
Lieutenant George Clem of the Police Department of the city of Athens testified that about 1:50 A.M. January 4, 1979, he received a call to go to 804 Lucas Street; he went and found the alleged victim lying on his bed. The victim was dead at the time. The witness testified that he viewed the body after it was removed to the funeral home and observed “several stab wounds on the chest and shoulders.” The victim’s son, Jerome Clark, was in his father’s house at the time Lt. Clem arrived at the scene.
Jerome Clark testified that he had been awakened by the scream of his father and observed a man, whom he identified as the defendant, stabbing his father. He further testified:
“I got up and eased out the door. So when I got out on the porch I hollered and the dude looked around and so I ran out in the road.
[[Image here]]
“Q. Okay. What did you do after you got out of the house?
“A. Well, I ran out in the road and then I ran back around to the back. About that time he had left and my dad had come out on the front porch.
“Q. You saw your father sitting on the front porch?
“A. Yes, sir.
“Q. How close did you get to him?
“A. Well, I came back on the front porch and he told me to go over next door and call the law.
“Q. Was he bleeding?
“A. Yes, sir.”
Willie Pointer, another witness for the State testified that some time during the *606 night January 3-4, 1979, the defendant talked with him for about five minutes. Upon being question as to what defendant said to him, the witness testified:
“A. At first, he said he had killed a man and I asked him who.
“Q. Told you he had killed a man?
“A. Yeah.
“Q. Did he tell you who he had killed? “A. When I asked him.
“Q. Who did he say he had killed?
“A. He said he had killed Bud Clark.
“Q. What did you say?
“A. I said I didn’t believe it.
“Q. Did he tell you how he had killed Bud Clark?
“A. Told me he had stabbed him.
“Q. Did he tell you what he stabbed him with?
“A. Butcher knife.
“Q. Okay. Was the Defendant drinking?
“A. He had been drinking.
“Q. Had you ever seen the Defendant intoxicated before?
“A. Yeah.
“Q. In your opinion, was he intoxicated?
“A. No.”
On January 6, 1979, Lt. Clem obtained a written statement from defendant in which he admitted that late at night (two nights before) he and a woman with whom he was staying on Lucas Street had been drinking and they went to another house on Lucas Street and went in the house. He said:
“The man in the house got up out of bed when we went in and Elize hit him and he pushed her back, then I stabed [sic] him with a pocket knife. I think I stabed [sic] him in the stomach the first time, then I stabed [sic] him some more but I don’t know how many. After stabing [sic] this person several times we left the house... . ”
The statement consisted of two pages that commenced with the printed acknowledgment that the one making the statement had been advised and duly warned of his right to the advice of counsel and that he was not required to incriminate himself, that he expressly waived his “right to the advice of counsel,” that the statement was made of his own free will “without promise of hope or reward, without fear or threat of physical harm, without coercion, favor or offer of favor, without leniency or offer of leniency, by any person or persons whomsoever.” Lt. Clem testified that the handwriting on the statement was his own and that defendant affixed his signature to both pages of the written statement. Lt. Clem further testified:
“Q. Did you tell him that anything he said could be used against him in Court?
“A. Yes.
“Q. Did you tell him he had the right of a lawyer for advice before you started asking him any questions and to have a lawyer with him during questioning?
“A. Yes.
“Q. Did you tell him that if he could not afford a lawyer that one would be appointed for him before questioning started?
“A. Yes.
A major insistence of appellant is that the trial court erroneously admitted the “confession” of appellant. In his brief .he states as reasons therefor the following:
“Here, Appellant had been incarcerated in the Athens City Jail for a period of 48 hours. The officer interrogating the Appellant testified that Appellant had signed a waiver of rights and that the waiver process took only about two or three minutes (R--51). The Defendant had not been informed by the interrogating officers that he was charged with murder before the statement was taken (R-51). The Appellant was played a tape containing statements made by Willie Pointer; and afterwards, Appellant gave the police a statement. In light of all of these circumstances, Appellant’s statement was not of a voluntary nature.
We are unable to agree with appellant that the circumstances stated by him in his brief vitiate a waiver of his Constitutional rights to an attorney and against self-incrimination. There was a lengthy in cam *607 era hearing on the question. Appellant had been in the jail for a period of forty-eight hours before the statement was taken. He was confined on a charge unrelated to the killing of Bud Clark. The court was justified in concluding that the circumstance did not adversely affect the voluntariness of the incriminating statement. As to the time involved in the “waiver process” Lt. Clem said, “Probably two or three minutes or so, I didn’t time it. I don’t know.” Although Lt. Clem did not tell defendant that he was charged with murder before the statement was taken, he did tell defendant that he “wanted to talk to him about the murder of William Bud Clark.” It was not inappropriate for Lt. Clem to give defendant the benefit of the information that Lt. Clem had been given by Willie Pointer, which was conveyed in the best way possible for accuracy by permitting defendant to listen to the tape of the statement made by Willie Pointer.
The only other contention of appellant is that the “autopsy report was erroneously admitted in the absence of the preparer and the Appellant was deprived of his right to cross examination.”
The objection made to the introduction in evidence of the report was as follows:
“We object to the introduction, Your Honor. We would like to state into the record the reasons for the objection. The Defendant objects to the introduction of State’s Exhibit Number Seven for the reasons that the contents of this Exhibit are hearsay. That the preparer of this report, Mr. John H. Kilbourn, is not present in Court and the Defendant is denied the right to cross examine this Defendant. The introduction of this Exhibit into evidence denies the Defendant the right to be confronted by the witnesses against him. The introduction of this Exhibit into evidence is not an exception to the hearsay rule. The introduction of this Exhibit into evidence is not allowed by the Business Records Act of the State of Alabama. This Exhibit is not a record taken in the due course of business as that term is employed by the Legislature of the State of Alabama. This report violates the Defendant’s Constitutional rights.”
The “autopsy report,” constituting “State’s Exhibit Number Seven,” was admitted in evidence over defendant’s objection. According to the testimony of Brent Wheeler, a criminalist for the Alabama Department of Forensic Sciences, it had been in his “custody and control as laboratory supervisor with the Department of Forensic Sciences.” He said:
“The primary investigator in the case involving the State’s Exhibit Seven was John Kilbourn. The report consists of several memorandums prepared by one Mr. John Kilbourn. Memorandum by me, also. A memorandum by another member of my office in Huntsville, Martha Odom. A memorandum by another employee of my office in Huntsville, Rodger Morrison. The report, itself, the certified copy comprises State’s Exhibit Seven is several different reports. But the chief investigator was Mr. Kilbourn since it was a death case.”
Code of Alabama 1975, § 12 -21-35, provides in pertinent part:
“All transcripts of books or papers, or parts thereof, required by law to be kept in the office, custody or control of any public officer, agent, servant or employee of any municipality, city or county of the state of Alabama or the United States, when certified by the proper custodian thereof, must be received in evidence in all courts . . . . ”
In Bickerstaff v. State, Ala.Cr.App., 369 So.2d 315, 316 (1979), it is stated:
“Reports of a State toxicologist and copies thereof are public records which are likewise admissible when offered into evidence. Seals v. State, 282 Ala. 586, 604, 213 So.2d 645 (1968); Alabama Code § 12 - 21 -35 (1975); also see Alabama Code § 36-18-2 (1975). ...”
The quoted statement disposes of defendant’s asserted grounds of objection to the effect that the exhibit constituted hearsay and did not constitute any exception to the rule of exclusion as to hearsay. More *608 over, we should state that grounds of objection to the effect that the exhibit is not allowed as evidence under the “Business Records Act of the State of Alabama,” and that it was not taken “in the due course of business” as that term is employed in legislation, are not well taken, as obviously the exhibit was not admitted on the theory that it was such a business record.
Defendant’s objection to the introduction of the exhibit to the effect that it “violates Defendant’s Constitutional rights,” that Mr. Kilbourn was not in court and the defendant was “denied the right to cross examine,” and that the introduction of the exhibit into evidence denied “the Defendant the right to be confronted by the witnesses against him,” deserves further consideration. As to this contention, appellant relies largely upon Lowery v. State, 55 Ala.App. 514, 317 So.2d 365, cert. denied, 294 Ala. 763, 317 So.2d 372 (1975), which in many respects is like and indistinguishable from the instant case, but in some respects it is different and is to be distinguished from the problem now presented. The reversal in Lowery was largely by reason of the trial court’s admission in evidence of a certified copy of a death certificate of the victim of an alleged murder by defendant. It was held that its admission over an appropriate objection of the defendant, that it should be predicated by testimony of the physician who signed the death certificate, impinged upon his right to confrontation by witnesses against him, guaranteed by the Sixth Amendment of the Constitution of the United States, which now by judicial interpretation has been held to be applicable to trials in the state courts pursuant to the Fourteenth Amendment. It seems clear that in Lowery the objectionable feature of the death certificate was in the showing therein of the cause of victim’s death, which was an essential averment of the indictment charging defendant with the murder of the victim. To that extent the content of the death certificate in that case is like the portion of the autopsy report in this case, which states that the “cause of death” was “hemorrhage as a result of multiple stab wounds.” The remainder of all of the seven page report, denominated therein “Autopsy Protocol,” is a tribute to the accuracy, ability and thoroughness of the toxicologist, but to laymen it consists of minutiae of little, if any, significance. In this respect, the document was different from the document forming the basis of the reversal in Lowery.
Another distinguishing difference between this case and Lowery is that apparently in Lowery there was no evidence, independent of the certificate of death, that constituted evidence that the victim’s death was caused by wounds that other evidence showed were inflicted by defendant. In the instant case, there was testimony of the Limestone County Coroner, who also examined the body of the deceased. He testified that in his opinion the cause of Bud Clark’s death was “Hemorrhage due to multiple stab wounds.”
There was involved in Lowery the testimony on the trial, of a physician who treated the victim prior to his death. He did not view the victim after his death, but he was allowed to testify, over the objection of defendant, that in his opinion, based on personal information and on his examination of hospital records not made by him, the victim “died of the wounds that he sustained.”
In Lowery v. State, at p. 371, it is stated: “We are not holding that a certified copy of a death certificate is inadmissible. We hold that such cannot be used as the sole evidence in a criminal prosecution for murder to prove the cause of death where live witnesses are available to the state, but are not used for that purpose. Likewise, it cannot be used in conjunction with other documents introduced pursuant to Act No. 77, supra [Act No. 77, Acts of Alabama, 1965, 2d Special Session, approved September 30, 1965] or statutes of similar import where the end result would be proof of such key element of the murder charged solely on the basis of certified copies of documents, but without bringing forth available witnesses to confront the defendant or offer him an op *609 portunity to cross-examine them concerning their conclusions.
“The burden of proof in all criminal prosecutions rests upon the State, with the presumption of innocence attending the defendant until that burden of proof has been met. To allow the State to simply introduce a certified copy of a death certificate and thus shift the burden to the defendant to disprove the facts set out therein would be an unconstitutional burden of such weight as to deprive a defendant of a fair trial and due process of law.”
With full adherence to Lowery, supra, and measured by its standards, we find that the trial court was not in error in admitting in evidence State’s Exhibit No. 7. Furthermore, we note that the objection made by defendant was to the exhibit as a whole, not to separate portions thereof that include many entries that do not constitute any charge against defendant or tend to prove any essential elements of the indictment, and therefore could not reasonably be held to have deprived defendant of his constitutional right to confrontation by witnesses against him. It appears that some of the contents of the exhibit were favorable to defendant, particularly that part thereof utilized by defendant on cross-examination of the witness as to an analysis of a blood specimen of the victim showing 0.22% ethyl alcohol.
The opinion of the coroner that the stab wounds were the cause of the victim’s death was undisputed. There was no indication in the evidence to the contrary. Irrespective of any question whether State’s Exhibit 7 should have been admitted in evidence, the admission did not cause any substantial injury to defendant.
Our review of the record convinces us that there was no error prejudicial to defendant and that the judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of' § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment of the trial court is hereby.
AFFIRMED.
All the Judges concur.